IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| R.R. GREGORY CORPORATION,      )<br>    Plaintiff,                                   )<br>                                          )<br>v.                                        )<br>                                         )<br>                                         )<br>LABAR ENTERPRISES OF             )<br>ROCHESTER, INC., et al.,           )<br>    Defendants.                          ) | Civil Action No.  1:06-cv-1037 |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

This breach of contract case arises from the construction of Leeland Elementary School in Stafford, Virginia. The Stafford County School Board awarded the primary construction contract to plaintiff R.R. Gregory Corporation, and R.R. Gregory subcontracted the project's site work to defendant Labar Enterprises. Gregory terminated Labar's subcontract roughly one year later, citing delay and unsatisfactory work by Labar, and hired Rice Contracting to complete the work for which Labar had initially been hired.

Gregory filed suit against Labar claiming breach of contract and seeking $925,000 in damages. Labar filed its own breach of contract suit against Gregory and against Travelers Surety and Indemnity Company of America, which issued a payment bond for the project pursuant to the Virginia Public Procurement Act, VA Code § 2.2-4300 *et seq*. The two suits were consolidated in response to a motion by Gregory and Travelers. *R.R. Gregory Corp. v. Labar Enterprises of Rochester, Inc.*, 1:06cv1037 (E.D. Va. Nov. 28, 2006) (Order). The parties filed timely answers and following discovery Gregory and Travelers moved for summary judgment, which was denied. *R.R. Gregory Corp. v. Labar Enterprises of Rochester, Inc.*, 1:06cv1037 (E.D. Va. Mar. 29, 2007) (Order). The parties waived a jury and a bench trial was held, extending over approximately five

days in April, May, June, and August 2007. Following trial the parties were directed to file proposed findings of fact and conclusions of law, which they have now done. The following findings of fact and conclusions of law are issued pursuant to Rule 52, Fed. R. Civ. P. and are based on the trial record and the parties' written and oral arguments.

## **Findings of Fact**

Parties

    1. Plaintiff R. R. Gregory Corporation ("Gregory"), a Virginia corporation with its principal place of business in Waldorf, Maryland, is a general construction contractor specializing in federal, state, and local government building projects. Daniel Baden is Gregory's president.

    2. Defendant Labar Enterprises of Rochester, Inc. ("Labar") is a New York corporation with its principal place of business in Webster, New York. Labar specializes in excavation and other site preparation work. Defendant Vinzenzo LaBarbera is Labar's president and sole owner.

    3. Counterclaim defendant Travelers Casualty and Surety Company, Inc. ("Travelers"), a Connecticut corporation with its principal place of business in Hartford, Connecticut, is an insurance company.

Stafford County School Board Project

    4. On September 15, 2004, the Stafford County School Board awarded Gregory the primary contract for the construction of Leeland Elementary School in Stafford, Virginia. The contract was for a fixed price of $13,262,000 and provided for completion of the project by August 1, 2005. Mr. Baden testified that although this was an aggressive schedule, Gregory believed it could complete the project on time.

5. During the following month, Mr. LaBarbera submitted a bid to Gregory for the site work portion of the project. Site work refers to various tasks directed to preparing the site and making it suitable for construction and occupancy, including clearing the construction site, constructing a building pad, providing erosion and sediment control, installing storm and sanitary sewer systems, installing a water system, constructing curbs and gutters, grading, paving, fertilizing, seeding and sodding of grass areas, fencing, installing recreational facilities, and all related work required to complete these tasks. On October 6, 2004, Gregory subcontracted with Labar for the excavation and site work portion of the construction. Gregory and Labar initially agreed to a subcontract price of $1,800,000. It is undisputed that the subcontract contained the following terms:

> "6. Time is of the essence. Subcontractor shall proceed with work including overtime performance as necessary and as required by the Schedule of Progress, which may be subject to change as working conditions require. . . .
>
> 9. The following shall be deemed a breach of this agreement: failure to fulfill any obligation of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities."

Construction of Building Pad

6. Gregory and Labar initially agreed that Labar would excavate the school's building pad by November 1, 2004. A building pad is a flat site upon which a building is constructed. On October 11, 2004, Gregory instructed Labar to begin work on the site in order to meet the November 1 deadline. Yet, Labar did not begin work until October 22. Seeking to excuse its failure to commence work in a timely manner, Labar introduced evidence that the project site's boundaries had not been staked prior to October 22, 2004. Yet, Gregory's evidence persuasively showed that staking was a simple task that was not completed until October 22 only because Labar was not present on

site until that date.

      7. After excavation work commenced, discovery of an outfall pipe resulted in revision of completion deadlines. According to the revised schedule Labar was to complete the building pad by November 24, 2004. Gregory gave Labar notice that completion of the building pad was a "critical path" item[1] and could not be delayed because construction could not go forward until the building pad was substantially complete.

      8. On November 4, 2004, Mosely Architects (the "project architect"), to whom the School Board had given ultimate supervisory authority on the project, issued four change orders that resulted in additional sediment and erosion control work by Labar. Although Mosely only approved an 8-day extension of the building pad deadline, Gregory and Labar agreed to extend the deadline by 15 days, until December 9, 2004.

      9. Despite the deadline extension, Labar did not complete the building pad by December 9, 2004. At trial, Mr. LaBarbera testified that Labar's delay was principally due to wet weather conditions. Although the subcontract specifically directed Labar not to perform site work in such conditions, the subcontract limited excusable weather-related delay to the average number of wet weather days in a given month, as determined by the National Oceanic and Atmospheric Administration (NOAA). The subcontract required Labar to support any claim for additional weather delays with data from NOAA. Labar did not provide this data in support of its claimed wet weather delays. Moreover, contrary to Labar's claim of weather-related delay, Gregory introduced convincing and credible evidence that Labar's delay in completing the building pad was due to a

---

[1]"Critical path" refers to aspects or phases of a project that must be completed in a timely manner for the project as a whole to be completed on schedule.

failure to commit adequate manpower and equipment to the task.

10. Because construction could not proceed until the building pad was completed, the construction of the school building was delayed until Labar completed the building pad. The building pad was not entirely completed until the second week of January, 2005, although Labar had completed one corner of the building pad by January 3, 2005 and construction of the school building was able to proceed from that date. Construction was therefore delayed by 25 days from December 9, 2004 until January 3, 2005.

11. Although Gregory's scheduling expert opined that extending the building pad deadline to November 24, 2004 made it difficult for Gregory to meet the overall August 1, 2005 deadline, Mr. Baden, a consistently credible and persuasive witness, testified that Gregory would have had a "good chance" of completing the project by the start of the 2005/2006 school year had the building pad been completed by December 9, 2004.

12. Mr. Baden's testimony persuasively established that Labar's delay in completing the building pad was due to Labar's failure to dedicate sufficient manpower and equipment to the project. In fact, Mr. Baden pointed out these deficiencies to Mr. LaBarbera from an early date, and although Mr. LaBarbera assured Mr. Baden that Labar would be able to meet its deadlines, this did not occur; Labar did not adequately increase the number of employees or the type and amount of equipment necessary for Labar to complete its tasks in a timely manner.

13. Gregory ultimately completed the project 87 days behind schedule. The evidence introduced at trial establishes that Labar's delay in completing the building pad, including its failure to dedicate necessary manpower and equipment, was the proximate cause of 25 days of delay in completing the project.

Paving and Fine Grading

14. In light of the delay in completing the building pad, Gregory issued a revised schedule on December 28, 2004, and a further revised schedule on February 16, 2005. According to the February revised schedule, Labar was required to complete paving tasks by August 23, 2005. Completion of paving tasks required Labar to construct a curb and gutter and to 'fine grade' and 'roll' the parking lot areas. According to a revised schedule issued in May, 2005, installation of curbs and gutters was to be completed by the end of June 2005.

15. Despite these important deadlines, Labar performed minimal paving work in the spring and early summer of 2005. According to Gregory's records, in August 2005 Labar laid only ten percent of the parking lot's stone 'sub-base' and did no other paving work. In the circumstances, Labar failed to complete its paving tasks by the August 23, 2005 deadline as required. As a consequence, on August 25, 2005, the project architect sent Gregory a "Notice of Defective or Non-Conforming Work" which noted that fine grading and rolling of the parking areas was "far from complete" and directed completion by August 26, 2005. Gregory in turn gave Labar notice that "[f]ailure to comply with this deadline will force us to supplement your forces," and reminded Labar that under the terms of the subcontract Labar would be liable for the costs of supplemental workers. Nevertheless, Labar failed to complete fine grading and rolling of the parking area by August 26, 2007.

16. Christopher Craig, Gregory's former Vice President, credibly and convincingly testified that Labar failed to complete its paving work because Labar either lacked necessary equipment or regularly removed necessary equipment to another construction project. Fine grading, according to this record, requires a "motor grader" which Labar did not have and without which Labar was unable

to prepare the stone base for asphalt paving. According to Mr. Baden, Labar attempted to accomplish fine grading by using a bulldozer, which is unsuitable for fine grading.

17. Paving was also delayed because Labar did not complete necessary curb and gutter construction. Curbs and gutters must be completed prior to the completion of a stone sub-base, without which paving cannot be done. Yet, Labar did not begin work on curbs and gutters until September, 2005.

18. Mr. Baden testified that Labar intended to pave the entire parking lot at once, but that this was not practical given Gregory's and other subcontractors' need to keep equipment on one part of the lot. Gregory instead directed Labar to pave the lot in stages, in order to allow Gregory and the other subcontractors to move their equipment from one part of the lot to another as each section was paved.

19. The evidence introduced at trial establishes that Labar failed to complete paving tasks, including curb and gutter preparation, in a timely manner as required by the construction schedule and the Labar subcontract. Rice Contracting ultimately paved the lot according to Gregory's incremental paving plan.

Installation of Utilities

20. Part of Labar's site work involved the installation of utilities, which required Labar to dig trenches and perform sediment and erosion control work. Labar began this work in the spring of 2005, but in digging trenches Labar failed to support the trenches properly, exposing utility installation workers to danger. Gregory became aware of this safety concern on three separate occasions, and on each occasion Gregory halted Labar's work until the safety concerns were

addressed.

21. In June 2005, Gregory's field superintendent discovered that Labar's sediment and erosion control work was defective. Specifically, Gregory discovered that Labar had not taken adequate inclement weather protection measures. As a result, silt had accumulated in the system and threatened to escape into and pollute a nearby pond.

22. In this same time frame, an inspector representing the school board discovered deficiencies in Labar's utility-related excavation work. Specifically, some of Labar's trenches had been inadequately back-filled with soil that had not been properly compacted. This deficiency remained unaddressed through August, 2005.

23. While these issues represent further deficiencies in Labar's performance, they are not deficiencies Gregory identifies as material breaches of Labar's subcontract.


Subcontract Termination

24. Mr. Craig sent Mr. LaBarbera letters on September 14, September 16, and September 20 expressing Gregory's dissatisfaction with Labar's performance. On September 21, 2005, with paving work still incomplete, Gregory sent Labar a three-day cure notice pursuant to paragraph 9 of the subcontract, stating as grounds for termination Labar's failure to complete paving work by the deadline established in the construction schedule and Labar's failure to dedicate sufficient manpower to the project. Labar was given three days to complete the work indicated in the cure notice. Labar did not complete this work as required. As a result, Gregory sent Labar a formal notice of termination for default on September 26, 2005, reminding Labar that it would be held responsible for the costs Gregory would incur completing the site work.

25. Shortly thereafter, Gregory hired Rice Contracting to complete Labar's subcontract. Kevin Rice of Rice Contracting, who provided credible testimony, estimated that perhaps 50-60% of the site work had been completed when Rice Contracting began work on September 28, 2005.[2] Rice dedicated two to three crews, working ten to twelve hour days, to complete the site work on schedule. Rice engaged in a variety of activities related to the incomplete site work, including installation (and re-installation) of utilities, re-grading of an access road and the parking lot, installation of bio-retention areas, and so on. The project was substantially completed on November 28, 2005.

26. At trial, Mr. LaBarbera testified that Labar submitted two invoices for work performed in August and September, 2005, that were never paid by Gregory. He also claimed that Gregory was paid by the School Board for this work. Aside from Mr. LaBarbera's own testimony, which is not credited here, Labar has introduced no evidence that Gregory profited from work performed by Labar for which Gregory did not compensate Labar.

27. Labar also argued at trial that Rice performed work beyond the scope of the Labar subcontract, and that Gregory had failed to apportion the amount of Rice work for which Labar would be liable under the subcontract. Labar argues that this failure to apportion bars any recovery by Gregory. Mr. LaBarbera identified two areas of work performed by Rice that were not part of the Labar subcontract. First, Rice filled Sediment Basin #2, which would have been the subject of a

---

[2] Mr. LaBarbera testified that at the date of termination Labar's work was essentially complete, and Labar needed only to put "the icing on the cake." To the degree that this testimony conflicts with Mr. Rice's testimony, the latter's testimony is more credible and convincing and more consistent with other credible evidence presented. Mr. LaBarbera's felony conviction is relevant, although not dispositive, in this credibility determination. Indeed, the same result would obtain even in the absence of the felony conviction.

change order had Labar remained on the job.  Daniel Craig, Gregory's Vice President at the time of the events at issue, testified that the parties had negotiated the terms of a change order involving this sediment basin, and that Mr. LaBarbera sought no more than $50,000 for the work.

28. Second, Labar claims that Rice performed work spreading dirt around the work site, and that this work was not part of the Labar subcontract.  Mr. LaBarbera admitted that Labar would have been responsible for spreading dirt under the terms of its subcontract, but he claimed that Rice spread the dirt to a greater depth than Labar would have been obligated to do without a change order.  Labar has introduced no credible evidence to support the contention that its dirt-spreading responsibilities were limited in this fashion.

29. Gregory conceded at trial that Rice performed work on a fire road that was beyond the scope of the Labar subcontract.  There is some evidence that this work was made necessary by deficiencies in Labar's site work.  In any event, the record reflects that this additional work cost no more than $5,000, and Labar has not contradicted this specific apportionment.

Costs

30. Gregory and Labar initially contracted for a subcontract price of $1,800,000.  The adoption of certain change orders increased Labar's duties, and the subcontract price was accordingly increased to $1,843,877.33.  To date, Gregory has paid Labar a total of $1,090,274.

31. Following termination of Labar's subcontract, Gregory settled a lawsuit brought by Vulcan Materials, a Labar subcontractor, for $52,500.  Gregory also settled a lawsuit brought by ACF International, Inc., another Labar subcontractor, for $39,547.59.  Labar presented no evidence to contradict that it owed these subcontractors the amounts paid by Gregory to settle the claims, nor

that the amounts of the settlements were unreasonable.

32. Gregory paid Labar and Labar's sub-subcontractors $1,182,321.59 for their work toward completion of the Labar subcontract. This figure represents the amount paid to Labar ($1,090,274) plus the amounts paid to Vulcan Materials ($52,500) and ACF International, Inc. ($39,547.59).

33. Rice Contracting completed Labar's subcontract work on a time and materials basis. Rice submitted a total of $986,544.46 in invoices. Gregory credibly represents that no more than $55,000 of this amount was paid for work beyond the scope of the Labar subcontract. Specifically, Gregory has introduced evidence that Labar sought no more than $50,000 to fill Sediment Basin #2, and Labar does not contest Gregory's representation that Rice performed $5,000 of additional work related to the fire road.

34. In connection with the completion of the Labar subcontract, it is uncontested that Gregory incurred $373,122.11 in direct costs. Gregory also incurred $9,031.46 in labor costs.

35. Pursuant to an agreement between Gregory and the School Board, the School Board withheld $2,000 per day in liquidated damages for each day beyond the scheduled completion date that the project remained incomplete.

## Conclusions of Law

The essential question is whether Labar breached the terms of its contract with Gregory when it failed to complete the building pad and paving work by the deadlines imposed by Gregory's schedule of progress. Labar does not contest the existence of a valid contract, and there is no dispute regarding the terms of that contract. It is axiomatic that where there is no ambiguity in a contract's terms, the plain meaning of those terms must be given effect. *Quillen v. Titus*, 2 S.E.2d 284, 287 (Va. 1939). It is similarly well settled that, even absent an express contract term, unreasonable delay

in performance of a contract constitutes material breach. 23 Williston on Contracts § 63:18 (4th ed.); *see also Portsmouth Redevelopment and Housing Authority v. Ison*, 66 Va. Cir. 336 (Va. Cir. Ct. 2005).

The unambiguous terms of the Labar subcontract obligated Labar to complete its work "as necessary and as required by the Schedule of Progress." Labar materially breached the subcontract by failing to complete its work "as required by the Schedule of Progress." Specifically, Labar failed to construct the building pad by the revised December 9, 2004 deadline, and Labar failed to complete paving by the August 23, 2005 deadline. Accordingly, Labar is liable to Gregory for breach of contract and is obligated to pay Gregory damages as provided in the contract and as prescribed by law.

Labar argues that Gregory failed to pay Labar for work performed in August and September 2005. Gregory argues that Labar is precluded from making this claim because Labar did not have a subcontractor's license at the time of the project. Virginia allows a party to assert an adversary's lack of license as a defense in a suit for unpaid balances only where the unlicensed adversary has not given "substantial performance within the terms of the contract." Va. Code Ann. § 54.1-1115(C) (2004). The parties dispute the meaning of the statutory phrase "substantial performance" in this context. The record shows that Labar performed approximately 65% of the subcontract work. Labar argues that it has therefore performed the substantial part of the work contemplated by the subcontract. Gregory urges a more formalistic approach, arguing that "substantial performance" means performance "in good faith and in compliance with the contract except for minor and relatively unimportant deviations." 17A Am. Jur. 2d Contracts § 619. Gregory suggests that performance of only 65% of the subcontract work does not meet the standard definition of

substantial performance.

In the circumstances, it is unnecessary to resolve this dispute, for even if Labar is not barred from bringing its claim, it has failed to introduce sufficient evidence to allow a determination of that claim. More to the point, because Labar breached its contract prior to Gregory's alleged failure to pay, such a failure would not constitute a breach of contract even if it were established by the evidence. *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997) (holding that a party committing a material breach cannot thereafter enforce the contract). Accordingly, Labar's claims against Gregory and Travelers must be dismissed.

Labar also argues that Gregory was itself responsible for delay. The mere fact that a general contractor suffered its own delays does not excuse a subcontractor's failure to perform the subcontract by the contractual deadline. *Sands & Oliver v. Quigg*, 69 S.E. 440, 441–42 (Va. 1910).[3] Importantly, however, Labar can only be held responsible for damages caused by its breach and delay, and Gregory bears the burden of establishing a causal connection between Labar's breach and

---

[3] Indeed, the Virginia Supreme Court addressed Labar's precise argument almost one hundred years ago:

> "The evidence shows that Quigg did not so prosecute his work as to enable him to finish it within the stipulated time, though he was frequently importuned upon the subject, urged to put on additional forces, and was finally notified verbally that the contractors would proceed to employ additional forces and put them on the work, so that it might be completed within the specified time . . . . Counsel for the appellee suggests that not only their client, but the appellants and every other subcontractor . . . were in default; but it is not perceived that this suggestion excuses the appellee from a compliance with its contract. All who were engaged upon the work suffered from bad weather and from the many casualties incident to such employment . . . but these considerations cannot control the express terms of the contract into which the parties entered." *Sands & Oliver*, 69 S.E. at 442.

The striking similarity between the circumstances in *Sands & Oliver* and in the case at bar brings to mind the familiar aphorism, *plus ça change, plus c'est la même chose*.

delay and the damages claimed. *Haas & Broyles Excavators, Inc. v. Ramey Brothers Excavating Company, Inc.*, 355 S.E. 2d 312, 315 (Va. 1987). It is next necessary, therefore, to ascertain the damages caused by Labar's breach.

Gregory seeks damages caused by Labar's breach of the subcontract. The damages sought fall into three categories: (i) liquidated damages caused by the delay in completing the building pad; (ii) damages incurred directly by Gregory in completing the Labar subcontract; and (iii) damages incurred by Gregory as a result of having to hire Rice Contracting to complete the Labar subcontract. Gregory must establish a causal connection between Labar's breach and each of these categories of damage.[4] *Hale v. Fawcett*, 202 S.E.2d 923, 925 (Va. 1974) ("To recover damages in any case, a plaintiff must prove with reasonable certainty the amount of his damages and the cause from which they resulted. There can be no recovery where speculation or conjecture must be resorted to in order to determine what caused the damage complained of.").

**A.**

Gregory and the School Board agreed that the School Board would withhold $2,000 for each day beyond the scheduled completion date that the project remained incomplete. Gregory has established that Labar's completion of the building pad was delayed by 25 days, from December 9, 2004 to January 3, 2005, and that this delay constituted a breach by Labar of its subcontract with

---

[4] Gregory claims that paragraph 9 of the subcontract entitles it to a 15% 'markup' on completion costs. No explicit provision in the subcontract entitles Gregory to such a sum. The subcontract simply provides that in the event of a breach, "Subcontractor and its surety shall continue liable for all costs to complete and any damages and expenses including reasonable counsel fees, reasonable overheard and profit, liquidated damages assessed by the Owner and other liabilities which may result from the default and breach." Gregory has presented no evidence to support its 15% 'markup' claim.

14

Gregory. Although Gregory's scheduling expert testified that extension of the building pad deadline beyond November 24, 2004 made it "very difficult" for Gregory to complete the project by the August 1, 2005 scheduled completion date, the record nonetheless convincingly establishes that Labar's delay in completing the building pad postponed the ultimate completion of the project by 25 days. Accordingly, Gregory has established that Labar's breach was the proximate cause of 25 days of delay. This delay caused damages in the amount of $50,000, representing the liquidated damages owed by Gregory to the School Board for 25 days of delay.

**B.**

Paragraph 9 of the Labar subcontract provides that in the event of termination Labar "shall continue liable for all costs to complete." Gregory presented credible and convincing evidence that it incurred direct costs in completing the Labar subcontract in the amount of $373,122.11. Gregory also presented credible and convincing evidence that it incurred labor costs in completing the Labar subcontract in the amount of $9,031.46. Labar has not disputed these figures. Accordingly, Gregory has established that Labar's breach caused damages in the amount of $382,153.57.

**C.**

Gregory has also presented evidence that it retained Rice Contracting to complete the Labar subcontract, and that Rice submitted invoices in the total amount of $986,544.46. Gregory conceded at trial that Rice may have performed some work beyond that required by the Labar subcontract, specifically $55,000 attributable to filling a sediment pond, spreading dirt, and repairing a fire road.

Labar argues that Gregory's failure specifically to apportion the Rice invoices defeats any claim Gregory might have to damages related to the Rice invoices. In fact, Gregory has apportioned the Rice invoices. Labar identified two areas of work performed by Rice that were beyond the scope

15

of the Labar subcontract: (i) filling Sediment Basin #2 and (ii) spreading dirt around the site. Gregory has introduced evidence that Mr. LaBarbera himself costed the sediment basin work at no more than $50,000, and Mr. LaBarbera admitted at trial that spreading dirt was in fact part of the Labar subcontract. Gregory has also identified $5,000 worth of work related to construction of a fire road that was not part of the Labar subcontract. Labar has identified no other work performed by Rice that was not part of the Labar subcontract.

In any case, while Virginia law requires a party seeking damages to "prove with reasonable certainty the amount of his damages and the cause from which they resulted,"[5] a plaintiff "is not required to prove with mathematical precision the exact amount of loss when the existence of damage is established and the facts and circumstances proven are such as to permit an intelligent and probable estimate of the amount of damages or loss sustained."[6] Although Gregory has arguably not proved with mathematical precision the exact portion of the Rice work that was necessary to complete the Labar subcontract, Gregory has clearly established (i) that Labar's breach required Gregory to hire another company to complete the subcontract work; (ii) that Rice was hired for this purpose; and (iii) that the substantial amount of Rice's work was necessary to complete the Labar subcontract. Moreover, Gregory has proved sufficient facts and circumstances to permit "an intelligent and probable estimate" of the portion of the Rice work that was beyond the terms of the Labar subcontract. *Gertler*, 116 S.E.2d at 270. Specifically, Gregory's evidence that Rice performed no more than $55,000 worth of work beyond the scope of the Labar subcontract meets the *Gertler*

---

[5] *Hale*, 202 S.E.2d at 925.

[6] *Gertler v. Bowling*, 116 S.E.2d 268, 270 (Va. 1960); *see also Chesapeake & Potomac Tel. Co. of Va. v. Carless*, 102 S.E. 569, 571 (Va. 1920).

standard; it is an intelligent and probable estimate of the damages Gregory sustained.

Accordingly, Gregory has met its legal burden by establishing the existence of damage and proving facts and circumstances that permit an intelligent and probable estimate of the amount of damages or loss sustained. Gregory is therefore entitled to a further $931,544.46 in direct damages from Labar for work performed by Rice Contracting in completing the Labar subcontract.

Gregory has therefore established that Labar breached its subcontract by failing to complete the building pad by the December 9, 2004 scheduled completion date and by failing to complete paving and fine grading by the August 23, 3005 scheduled completion date. Gregory has further established that these breaches proximately caused Gregory a total of $702,142.29 in damages, calculated as follows:

A.  Costs Related to Completion of Labar Subcontract
    1. Amount Paid to Labar & Sub-Subcontractors    $1,182,321.59
    2. Amount Paid to Rice    $931,544.46
    3. Amount Paid to Other Subcontractors    $373,122.11
    4. Amount Incurred by Gregory    $9,031.46
    5. TOTAL    $2,496,019.62

B.  Subcontract Price    $1,843,877.33

C.  Difference (A – B)    $ 652,142.29

D.  Liquidated Damages    $ 50,000.00

E.  TOTAL (C + D)    $ 702,142.29

In other words, Gregory's damages amount to the difference between the total cost required to complete Labar's subcontract work ($2,496,019.62) and the negotiated Labar subcontract price ($1,843,877.33), plus liquidated damages in the amount of $2,000 per day for 25 days of delay

17

($50,000).

       An appropriate order will issue.


|  |  |
|---|---|
| Alexandria, Virginia<br>November 8, 2007 | _____/s/_____<br>T.S. Ellis III<br>United States District Judge |